IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBIN STRINGFELLOW,               )
                                  )
        Plaintiff,                )
                                  )
        v.                        )        Civil Action No. 18-733
                                  )
UNITED STATES OF AMERICA,         )
                                  )
        Defendant.                )

## MEMORANDUM OPINION

Robin Stringfellow ("Plaintiff") was injured when a car in which she was a passenger collided with a vehicle driven by a United States Army officer. In this negligence action filed under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) *et seq.* ("FTCA"), she seeks compensatory damages from the United States of America ("Defendant"). Pending before the Court are parties' motions for partial summary judgment. For the reasons that follow, Defendant's motion (ECF No. 33) will be denied, and Plaintiff's motion (ECF No. 37) will be granted in part and denied in part.[1]

## I.   PROCEDURAL HISTORY

In March 2017, Plaintiff submitted an administrative claim related to this accident to the United States Army as required by 28 U.S.C. § 2675, and subsequently filed the instant

---

[1] Under the Federal Magistrate Judges Act, "[u]pon consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court." 28 U.S.C. § 636(c)(1). Consent of all parties to a case gives the magistrate judge full "authority over dispositive motions, conduct of trial, and entry of final judgment, all without district court review." *Roell v. Withrow*, 538 U.S. 580, 585 (2003). Both parties consented to the magistrate judge's jurisdiction. (ECF Nos. 9, 13.)

Complaint.[2] (ECF No. 1.) After the close of discovery, the parties both moved for partial summary

judgment, and their motions have been fully briefed. ECF Nos. 34, 38, 42, 45, 48, 49.)

## II.   FACTUAL BACKGROUND[3]

### A.   The Accident

This litigation arises out of an accident that occurred on October 16, 2015. (Defendant's

Statement of Facts ("Def.'s SOF"), ECF No. 35 ¶ 2; Plaintiff's Response to Def.'s SOF ("Pl.'s

Response"), ECF No. 46 ¶ 2; Plaintiff's Statement of Facts ("Pl.'s SOF"), ECF No. 39 ¶ 2;

Defendant's Response to Pl.'s SOF ("Def.'s Response") ECF No. 43 ¶ 2).)[4] On the day of the

accident, Plaintiff was a passenger in the back seat of her daughter's car when it collided with the

vehicle driven by a United States Army officer, Earnest Nicholson. (Def.'s SOF ¶ 2.) Nicholson

had proceeded from a stop sign and was attempting to cross two lanes of traffic. (Pl.'s SOF ¶¶ 7,

9.) Nicholson admitted that his vision was obstructed by traffic as he pulled into the intersection

and entered the lane of the car driven by Plaintiff's daughter. (Pl.'s SOF ¶¶ 8, 9.) He further asserts,

however, that the conduct of Plaintiff's daughter was the cause of the accident, in part because he

---

[2] Section 2675 provides that "[a]n action shall not be instituted upon a claim against the United States" for damages caused by "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency . . . ." 28 U.S.C. § 2675(a). If the agency denies the claim or fails to resolve it within six months, as is the case here, the claimant then may file an action with respect to her claim in a district court. *Id.*

[3] The facts set forth herein are from evidence that is either undisputed as indicated by the parties or otherwise supported by the record. In addition, where relevant and appropriate, disputed facts are also identified. Disputed facts are viewed in the light most favorable to the nonmoving party in accordance with *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[4] For the remainder of this section, the Court omits separate citations to Plaintiff's Response where Plaintiff unequivocally admits to a fact contained in Defendant's Statement of Facts. Similarly, the Court omits separate citations to Defendant's Response to Plaintiff's Statement of Facts where Defendant unequivocally admits to a fact contained in Plaintiff's Statement of Facts. The Court further omits duplicative citations to both parties' statements of facts where the parties allege identical facts.

alleges that she was speeding. (Def.'s Response ¶ 9.) It is disputed whether Plaintiff's daughter was traveling over the speed limit at the time of the accident. (Def.'s SOF ¶ 3; Pl.'s Response ¶ 3.)

At the time of the accident, Plaintiff lived with her son and was covered by his limited tort insurance policy. (Def.'s SOF ¶¶ 64, 65.)

B. Investigation of Accident

Pursuant to U.S. Army regulations, the Pennsylvania National Guard conducted a "Financial Liability Investigation of Property Loss" and recommended to the General Services Administration ("GSA") that Nicholson "re-take accident avoidance course for further training" and be held financially liable for damage to the Army vehicle involved in the accident. (Pl.'s SOF ¶¶ 11, 12; Def.'s Response ¶¶ 11, 12.) This recommendation was based on the investigator's findings, which were principally grounded on his review of the police report, that Nicholson was at fault for pulling out in front of the other driver and that there was no evidence that the other driver, i.e., Plaintiff's daughter, was at fault. (Pl.'s SOF ¶ 11.)[5]

After Nicholson sought reconsideration, the Pennsylvania National Guard's Office of the Staff Judge Advocate found the Financial Liability Investigation involving the "loss/damage/destruction" of Nicholson's GSA vehicle "legally sufficient" and determined that: "[t]he proceedings comply with the legal requirements of AR 735-5"; [a] preponderance of the

---

[5] Defendant objects to the use of the Pennsylvania National Guard's reports to prove that Nicholson was solely at fault for the accident, "because said reports contain inadmissible hearsay, to which no exception applies." (Def.'s Response ¶¶ 11, 12, 14, 16.) "[H]earsay statements can be considered on a motion for summary judgment if they are capable of admission at trial." *FOP v. City of Camden*, 842 F.3d 231, 238 n.14 (3d Cir. 2016) (quoting *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 223 n.2 (3d Cir. 2000)). Plaintiff asserts that the challenged reports are admissible under either Federal Rule of Evidence 801(d)(2), i.e., admission by a party-opponent, or Federal Rule of Evidence 804(b)(3), the statement against interest exception. Defendant notes that the investigation and report were prepared by the Pennsylvania National Guard, not the United States, and were based upon an inadmissible police report. This issue will be addressed at a later point in this opinion.

evidence supports the findings"; and "[t]he apppointing [sic] authority's recommendations are consistent with the findings." ((Pl.'s SOF ¶ 13; Def.'s Response ¶ 16.) The GSA charged Nicholson $4,174.63 for the loss of government property. (Def.'s Response ¶ 12.)

### C. Plaintiff's Injuries and Treatment

As a result of the accident, Plaintiff injured her left (non-dominant) arm and was transported to the Uniontown Hospital, where x-rays revealed a spiral fracture of the shaft of her left humerus. (Def.'s SOF ¶¶ 5, 7, 8.) At Plaintiff's request, she was transferred that evening from Uniontown Hospital to West Virginia University's Ruby Memorial Hospital ("Ruby"). (*Id.* ¶ 10.) At Ruby Hospital, hospital personnel confirmed a mid-distal comminuted spiral fracture of Plaintiff's left humerus. (*Id.* ¶ 12.) The next day, Plaintiff elected to have the fracture repaired surgically and Dr. John France performed an open reduction internal fixation ("ORIF") procedure, which involved the insertion of several screws and a plate along the shaft of Plaintiff's humerus. (*Id.* ¶¶ 13–14.) Plaintiff's radial nerve was identified and protected throughout the procedure. (*Id.* ¶ 16.)

Plaintiff was discharged from the hospital the following day with a six-week prescription for pain medication and instructions for changing the dressing on her surgical wound. (*Id.* ¶ 17.) At that time, Plaintiff informed hospital personnel that she was leaving town soon and was instructed to make a follow-up appointment upon her return. (*Id.* ¶ 18.) Several days after her discharge, Plaintiff flew to Alabama for a pre-scheduled vacation to her parents' house. (*Id.* ¶¶ 19, 20.) While there, Plaintiff's surgical wound became infected prompting her to twice visit an urgent care facility. (*Id.* ¶ 22.) The infection was treated with antibiotics and the staff at the urgent care had to express purulence and remove stiches from the wound. (Pl.'s Response ¶ 22.) By the time

Plaintiff returned home from her vacation, the infection and the associated stitch abscess had resolved. (Def.'s SOF ¶¶ 22, 26.)

Upon her return, Plaintiff had four follow-up appointments for the ORIF procedure. (*Id.* ¶¶ 25.) Plaintiff's progress notes from those visits indicate that she initially complained about some radial nerve palsy, weakness, achiness, and hypersensitivity. (*Id.* ¶ 27.) Records from Plaintiff's first visit on November 12, 2015 reflect that she had minimal pain complaints and had been working on range of motion; the incision was well-healed; she was lacking about 5 degrees of full extension and had flexion to 110 degrees; and maintained a 5-pound lifting restriction with the left arm. (*Id.* ¶ 26.) Plaintiff was encouraged to work on range of motion of both her left shoulder and left elbow and to work on her forward flexion, but no additional treatment or medication was prescribed. (*Id.*)

At the second follow-up visit on December 3, 2015, it was noted that Plaintiff was about 5 degrees short of full extension and lacked 5 degrees of full flexion but was able to flex from about 5 to 95 degrees. (*Id.* at 27.) Plaintiff was advised to massage and work on desensitizing the left upper extremity at the incision and in the hand. (*Id.*) The notes from this visit reflect that Plaintiff was healing well; she could be weaned up to activity as tolerated with no limitations on weight bearing; there was no reason to prescribe further pain medication for her arm; and her radial nerve palsy was improving. (*Id.*; ECF No. 36-8 at 6.)

At her third visit on January 14, 2016, Plaintiff's radial nerve palsy was almost fully resolved and while she still had a little bit of hand weakness and hypersensitivity, she was pleased with her progress. (Def.'s SOF ¶ 28.) She had full range of motion of her elbow and her motor exam was normal with the exception of finger extensions, which were 4+/5 in comparison to the

right. (*Id.*) The x-rays of Plaintiff's left arm reflected that the fracture was consolidating nicely.

(*Id.*) She was advised that she was doing well and could engage in more activity as tolerated. (*Id.*)

At her final follow up visit on April 14, 2016, it was noted that Plaintiff's fracture had healed nicely, and that her radial nerve, as well as her wrist, finger, and thumb extensors, were all recovered. (*Id.* at 29.) Dr. France's notes from this visit state:

> I suspected that the left arm is not quite as robust looking as the right. She just needs to keep working on her strengthening. It sounds like her son has gotten her some dumbbells and she should continue to work on that to get her strength back. This should come over time. No restrictions on activity and she has full normal use. We see her back as needed. She can feel the hardware over the end of the plate over the posterior aspect of the capitellum and we talked about removing this if this ever became a problem. Unfortunately, we would have to take the whole plate out to get that out including mobilize the radial nerve, which we know is not a healthy nerve from the injury. At this point she does not want to consider that and would have to be very cautious about that if she need [sic]. She will call us back as needed.

(ECF No. 36-8 at 10.)

Plaintiff has not seen a doctor for treatment related to her arm since the April 14, 2016 visit.[6] (*Id.* ¶ 35.) However, according to the expert report of Plaintiff's medical expert, Victor R. Prisk, M.D., Plaintiff was seen by a plastic surgeon, Dr. Linda Camp, on April 24, 2019, for documentation of a scar and disfigurement of her left upper arm. (ECF No. 46-15 at 6.) She has not been prescribed or taken any pain medication for her arm since her original post-operative prescription. (Def.'s SOF ¶ 36.) Plaintiff has no current plans to see a doctor or any scheduled treatments for her arm. (*Id.* ¶¶ 75–76.)

Both parties have submitted expert reports regarding Plaintiff's medical condition. In a July 2, 2019 report authored by Plaintiff's expert, Dr. Prisk, he provides a recitation of Plaintiff's

---

[6] Plaintiff's assertion that her left arm was "examined" by her primary care physician on multiple occasions after April 2016 (Pl.'s Response ¶¶ 30-33, 35) is not supported by the record. The notations Plaintiff cites are mere copies of earlier entries from a February 2016 medical history. They do not reflect a string of separate "examinations."

complaints, which include that her left arm is "very weak and deformed," that her arm "gives out,"

and she experiences pain at a level of 5 out of 10 at its worst. (ECF No. 46-15 at 2.) He notes that

Plaintiff was seen by Dr. Camp in April 2019, who measured her scar to be 30 cm in length, 2 mm

in width and includes a 2 cm depression deformity with discoloration. (*Id.* at 6.)

> Dr. Prisk opines, among other things, that:

> [Plaintiff's] injury, and the surgery that followed, resulted in a radial nerve palsy and residual stiffness, weakness, atrophy, scarring and posttraumatic arthritis symptoms in the left upper extremity. She continues to have pain, loss of motion, and strength, and radial nerve symptoms and signs in the left arm, elbow, and hand. These symptoms, particularly the weakness and pain, result in disruption of activities of daily living that contributes to her stress and anxiety. She has complaints of depression and anxiety over the deformity of the left upper extremity with the long scar and disfigurement from the muscle atrophy. This deformity is a direct result of the need for open reduction and internal fixation of her humeral shaft fracture, the subsequent scarring, and radial nerve injury. This disfigurement is permanent and irreparable. The nerve palsy is also permanent and results in disability affecting the hand for dexterity, manipulating objects, grasping, and lifting.

(*Id.* at 8.)

> Patrick J. McMahon, M.D., Defendant's medical expert, comes to a different conclusion.

He finds that the radial nerve was not damaged as a result of the accident and was intact at the time

of surgery. (ECF No. 36-10 at 3.) He opines that Plaintiff has fully recovered from the fracture of

her left arm as well as any associated radial nerve neuropraxia as a result of the motor vehicle

accident, and that she requires no further medical care for these conditions. (*Id.* at 4.) He also

opines that any weakness in her left arm and atrophy are not uncommon but "need not be

permanent." (*Id.* at 3.) Dr. McMahon further states that there is nothing that medically precludes

Plaintiff from strengthening her arm and regaining muscle mass and she can reduce the difference

in the circumference of her arms by performing strengthening exercises. (*Id.* at 4.)

### D. Plaintiff's Current Limitations and Appearance

Plaintiff claims that as a result of the accident she continues to have problems with her arm, including not being able to cook as much as she used to, bath her youngest grandchild or buy groceries alone. (Def.'s SOF ¶ 51.) She also has difficulty lifting things and folding clothes. (*Id.* ¶ 51; Pl.'s Response ¶¶ 51, 52.) She is unable to lift anything that weighs more than a half-gallon of milk. (Def.'s SOF ¶ 51; Pl.'s Response ¶ 51.) On the other hand, she is able to drive, type for short periods of time, and grasp and lift objects with her left hand that weigh less than a half-gallon of milk and regularly care for her three grandchildren. (Def.'s SOF ¶¶ 52–56; Pl.'s Response ¶¶ 54, 55, 56.)

As a result of the ORIF procedure, Plaintiff has a scar on her upper left arm which she can cover by wearing clothing with sleeves. (Def.'s SOF ¶¶ 60-61.) She suffers from atrophy of her left arm and the circumference of her left upper arm measures approximately 2 centimeters (over three-quarters of an inch) less than the circumference of her right upper arm. (Plaintiff's Counter Statement of Facts (ECF No. 46 at 12–13 ("Pl.'s CSOF") ¶ 1; Defendant's Response to Pl. CSOF ("Def.'s Res. to Pl.'s CSOF"), ECF No. 49 ¶ 1.)[7]

### E. Plaintiff's Medical History Prior to the Accident

Prior to the accident, Plaintiff was diagnosed with and/or receiving treatment for, inter alia, chronic pain, degenerative disk disease, spinal disease/scoliosis, stenosis, bulging disk, bone spurs, rheumatoid arthritis, diabetes, anxiety, depression, and Cushing's Syndrome. (Def.'s SOF ¶ 40.) Plaintiff also has an extensive surgical history, having been operated on at least seven times before 2015. (*Id.* ¶ 42.) She last worked outside the home in 2009 or 2010 and went on disability as a

---

[7] For the remainder of this section, the Court omits separate citations to Defendant's Response, where Defendant clearly admits to a fact contained in Plaintiff's Counter Statement of Facts.

result of back pain in 2013. (*Id.* ¶¶ 49, 50.) Plaintiff's chronic pain and/or back issues have limited many of her activities, forcing her to stop doing heavy housework (like mopping, sweeping, vacuuming, and pulling on wet clothes); riding horses, motorcycles, and ATVs; reducing her ability to garden and walk; and causing her to take multiple prescription pain medications. (*Id.* ¶¶ 40, 41, 45–47.)

F.  Plaintiff's Administrative Claim

On March 10, 2017 Plaintiff submitted a Form SF-95 Claim for Damage, Injury, or Death ("SF-95 Form") to the United States Army. (*Id.* ¶ 63.) On the SF-95 Form, Plaintiff stated that as a result of the October 16, 2015 accident, she "sustained a broken left arm that required ORIF of her left humerus." (*Id.*) She did not reference any radial nerve issue on the form. Plaintiff also submitted supporting documentation in digital form, including her medical records, liens (with itemized bills), the first-party benefits log, the police report from the accident, photographs of her injuries, and radiology reports. (Pl.'s CSOF ¶ 8.)   In a response to Plaintiff's counsel, the Department of the Army specifically references her "radial nerve palsy." (ECF No. 46-21.)

**III.   STANDARD OF REVIEW**

Summary judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *N.A.A.C.P. v. North Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d

Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine triable issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue of material fact that precludes summary judgment. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

This standard does not change when the parties cross-move for summary judgment. *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016). When both parties move for summary judgment, "'[t]he court must rule on each party's motion on an individual and

separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Id.* (quoting 10A Charles Alan Wright et al., Federal Practice & Procedure § 2720 (3d ed. 2016)).

## IV.   DISCUSSION

### A.   Defendant's Motion for Partial Summary Judgment

Defendant seeks partial summary judgment on two grounds. First, it asserts that Plaintiff's injuries do not qualify as a "serious injury" under Pennsylvania's Motor Vehicle Financial Responsibility Law ("MVFRL"), and thus, as an individual covered by a limited-tort insurance policy, she can only recover her medical and out-of-pocket expenses that resulted from the accident.

In addition, Defendant asserts that this Court does not have subject matter jurisdiction over Plaintiff's radial nerve injury claim because she failed to properly present this claim at the administrative level.

#### 1.   Serious Injury

The MVFRL allows Pennsylvania drivers to elect either a "limited tort" or a "full tort" option when purchasing their car insurance. 75 Pa. C.S. § 1705. It further provides that individuals who elect limited tort coverage may "recover all medical and out-of-pocket expenses" arising out of an accident. *Id.* However, in exchange for lower rates, those individuals "cannot recover for pain and suffering or other non-economic damages unless the [their] injuries fall within the definition of 'serious injury.'" *Vetter v. Miller*, 157 A.3d 943, 948 (Pa. Super. 2017) (quoting *Varner-Mort v. Kapfhammer*, 109 A.3d 244, 248 (Pa. Super. 2015)); *see Washington v. Baxter*, 719 A.2d 733, 739 (1998) ("While fashioning the limited tort option, the legislature spent a great

11

deal of time balancing the rights of the limited tort elector to recover for noneconomic losses against the goal of lowering insurance costs.").

Plaintiff was covered by her son's limit tort policy at the time of the accident. Therefore, in order recover non-economic damages she must demonstrate that she suffered a "serious injury" due to the accident. The MVFRL defines "serious injury" as "a personal injury resulting in death, serious impairment of body function or permanent serious disfigurement." 75 Pa. C.S. § 1702. The determination of whether Plaintiff has suffered a serious injury must "be left to a jury unless reasonable minds could not differ on the issue of whether a serious injury had been sustained." *Washington*, 719 A.2d at 741.  As the Defendant points out, an action against the United States under the FTCA is tried by the court without a jury.  28 U.S.C. § 2402.

### Serious Impairment of Body Function

In *Washington*, the Pennsylvania Supreme Court adopted the following definition of "serious impairment of body function":

> The "serious impairment of body function" threshold contains two inquiries: a) What body function, if any, was impaired because of injuries sustained in a motor vehicle accident? b) Was the impairment of the body function serious? The focus of these inquiries is not on the injuries themselves, but on how the injuries affected a particular body function. Generally, medical testimony will be needed to establish the existence, extent, and permanency of the impairment...In determining whether the impairment was serious, several factors should be considered: the extent of the impairment, the length of time the impairment lasted, the treatment required to correct the impairment, and any other relevant factors. An impairment need not be permanent to be serious.

719 A.2d at 740 (quoting *DiFranco v. Pickard*, 398 N.W.2d 896, 901 (MI. 1986)).

In undertaking these inquiries, "[t]he question to be answered is not whether [Plaintiff] has adduced sufficient evidence to show that [she] suffered any injury; rather, the question is whether [she] has shown that [s]he suffered a serious injury such that a body function has been seriously impaired." *Id.* at 741. To survive summary judgment, Plaintiff must show that her injury "resulted

in such substantial interference with any bodily function as to permit a conclusion that the injur[y] ha[s] resulted in a serious impact on [her] life for an extended period of time." *McGee v. Muldowney*, 750 A.2d 912, 915 (Pa. Super. 2000).

Here, it is undisputed that Plaintiff fractured her left arm as a result of the accident. Therefore, Plaintiff's use of her arm represents the body function that was impaired.

The Court must next determine whether there are no genuine issues of material fact regarding whether Plaintiff sustained a serious impairment. In making this determination, the Court considers "the extent of the impairment, the length of time the impairment lasted, the treatment required to correct the impairment, and any other relevant factors." *Id.* at 740.  Based upon the record in this case, the Court finds that there are genuine material issues of fact regarding whether Plaintiff's impairment is serious.

As noted in *Washington*, medical testimony generally will be needed to establish the existence, extent, and permanency of the impairment. Both parties have submitted expert reports that diverge widely regarding the extent of the impairment, the length of time it lasted, the treatment required to correct it and other relevant factors.  As discussed previously, Dr. Prisk, Plaintiff's expert, states to a reasonable degree of medical certainty that Plaintiff's injury, and the surgery that followed, resulted in a radial nerve palsy and residual stiffness, weakness, atrophy, scarring and posttraumatic arthritis symptoms in the left upper extremity.  Dr. Prisk concludes that Plaintiff's symptoms, including pain, weakness, loss of motion and strength and radial nerve symptoms, disrupt her daily activities.  Further, he opines, her nerve palsy is permanent and results in disability affecting the hand for dexterity, manipulating objects, grasping and lifting.

There is also record evidence that Plaintiff underwent surgery, received treatment for approximately six months and is no longer receiving treatment, but continues to have problems with her arm.

By contrast, Defendant's expert, Dr. McMahon, concludes to a reasonable degree of medical certainty that Plaintiff has fully recovered from the fracture of her left arm as well as any associated radial nerve neuropraxia as a result of the motor vehicle accident, and that she requires no further medical care for these conditions.  He notes that any weakness in her left arm and atrophy are not uncommon but need not be permanent.

Thus, both the extent and length of the impairment are disputed.  The record includes other contradictory evidence regarding whether Plaintiff's impairment is serious. For example, while it is undisputed that as of her last examination by Dr. France in April 2016, he stated that her radial nerve and nerve palsy had recovered, and that she had "full normal use" of her arm, Plaintiff represents that she continues to experience symptoms that limit her ability to perform certain daily activities.

Simply put, these disputed facts, including but not limited to contradictory medical testimony, preclude summary judgment as a matter of law as to whether Plaintiff sustained a serious impairment.  This issue must be resolved at trial.

<u>Permanent Serious Disfigurement</u>

The MVFRL does not define "serious permanent disfigurement," and "there is an absence of Pennsylvania appellate authority on whether a single scar can constitute permanent serious disfigurement." *Holland v. Marcy*, 817 A.2d 1082, 1096 (Pa. Super. 2002) (J. Bowes, concurring and dissenting). "The best evidence with respect to permanent serious disfigurement is the appearance of the plaintiff." *Walsh v. Phillips*, 38 Pa. D. & C.4th 178, 182–83 (Com. Pl. 1997).

Here, as a result of the ORIF procedure, Plaintiff has a scar on her upper left arm, which she can cover by wearing sleeves. She also has atrophy of her left arm. With respect to the atrophy and scar, the parties' respective experts disagree regarding its permanence. Plaintiff's medical expert, Dr. Prisk, noted in his report that:

> [Plaintiff] was seen by Dr. Linda Camp on April 24, 2019, for documentation of a scar and disfigurement of her left upper arm. Upon examination, her left upper arm appeared to be much smaller in diameter, due to atrophy, than her right upper arm. The incision extended from the upper posterior humerus near the posterior axillary line and extended distally along the entire upper arm, extending onto the lateral aspect of the elbow. It measured approximately 30 cm. in length and 2 mm. in width and had a 2 cm. depression deformity with discoloration throughout its length. The soft tissues around it were hard to examine secondary to hypersensitivity, but there appeared to be no fluid collections or irregularities or evidence of suture abnormalities. In Dr. Camp's medical judgment as a skin expert and being a board-certified plastic surgeon, she believed that this scar was a permanent deformity that would not be improved by any further surgical treatment for the appearance of the scar. (Dr. Linda Camp's Report – Pages 1-4).

(ECF No. 46-15 at 6.)

Alternatively, defense expert Dr. McMahon, while noting this atrophy, concludes that it need not be permanent because almost every patient can regain strength if they participate in physical therapy and/or strengthening exercises. He goes on to state that there is nothing that would preclude Plaintiff from strengthening her arm and regaining muscle mass, which can result in reducing the difference in the circumference of her arms. While Plaintiff testified that she performed some home exercises recommended by Dr. France, the record does not reflect the time period within which she performed these exercises.

The record reflects that Plaintiff's left arm is smaller in circumference than her right arm. It is disputed whether the size differential of her arms can be minimized or eliminated with strengthening exercises or physical therapy. Moreover, the Court's review of the present appearance of Plaintiff's left arm is limited to the photographs submitted by Defendant and Plaintiff, which were taken approximately 3 years after the accident. (ECF No. 46-17 & 18). This

evidence is insufficient for the Court to determine as a matter of law whether the combination of the scar with atrophy represent a serious *permanent* disfigurement.  Because this threshold issue cannot be determined on the current state of the record, it must be determined at trial.

### 2.   Presentment

Defendant also argues that this Court does not have subject matter jurisdiction over Plaintiff's radial nerve injury claim because she failed to properly present any such claim at the administrative level.

"District courts have exclusive jurisdiction over suits against the United States brought under the FTCA." *Santos ex rel. Beato v. United States*, 559 F.3d 189, 193 (3d Cir. 2009) (citing 28 U.S.C. § 1346(b)). However, "[t]o make a claim under the FTCA, a claimant first must file her claim with the administrative agency allegedly responsible for her injuries." *Id.* (citing 28 U.S.C. § 2675(a); *Reo v. United States Postal Serv.*, 98 F.3d 73, 75 (3d Cir. 1996)). It is Plaintiff's burden to establish that a proper administrative claim had been filed. *Livera v. First Nat'l State Bank*, 879 F.2d 1186, 1195 (3d Cir. 1989) ("Although we have on occasion afforded a liberal interpretation to the *contents* of the pleadings, we have remained steadfast to a strict application of the filing requirements themselves.").

The Third Circuit Court of Appeals has explained that "notice in the form of an administrative claim 'satisfies section 2675's [presentment] requirement . . . if the claimant (1) gives the agency written notice of his or her claim sufficient to enable the agency to investigate and (2) places a value on his or her claim." *Roma v. United States*, 344 F.3d 352, 362–63 (3d Cir. 2003) 362–63 (3d Cir. 2003) (quoting *Tucker v. United States Postal Serv.*, 676 F.2d 954, 959 (3d Cir.1982)).

Defendant contends that by only citing a broken arm that required an ORIF procedure on the SF-95 Form, Plaintiff failed to "present" her radial nerve injury to the U.S. Army. However, "an administrative claim need not propound every possible theory of liability in order to satisfy section 2675(a)," so long as a plaintiff does not "present one claim to the agency and then maintain suit on the basis of a different set of facts." *Roma* at 362 (quoting *Deloria v. Veterans Admin.*, 927 F.2d 1009, 1011–12 (7th Cir. 1991)). Here, Plaintiff submitted a fully completed SF-95 Form to the United States Army with each of the questions answered, including a description of the accident, the parties involved, and the nature of her injury. The information furnished by Plaintiff reflects that the basis for her administrative claim is that she was injured in a motor vehicle accident as a result of Nicholson's alleged negligence. This was sufficient for the U.S. Army to conduct its investigation. Plaintiff also placed a value of $400,000 on her personal injury claim. That is all that was required to satisfy the presentment requirement of Section 2675.

It is also uncontroverted that Plaintiff provided the U.S. Army with her medical records to support her administrative claim. Those records highlighted issues with her radial nerve in conjunction with her broken arm and the ORIF procedure. Plaintiff's radial nerve injury arises out of the same set of facts as her broken arm, i.e., the motor vehicle accident and its aftermath. Moreover, the April 25, 2018 correspondence from the Department of the Army not only reflects the substance of its investigation, including its knowledge of the underlying accident and Plaintiff's medical treatment, but specifically references her "radial nerve palsy."

In short, Plaintiff's written notice supplied sufficient information for the U.S. Army to investigate her claim. Therefore, Plaintiff satisfied the presentment requirement of section 2675 and this Court has subject matter jurisdiction over her radial nerve injury claim.

For all of these reasons, Defendant's motion for partial summary judgment will be denied.

B. Plaintiff's Motion for Partial Summary Judgment

Plaintiff's motion for partial summary judgment seeks dismissal of Defendant's following affirmative defenses:

- Fourth Affirmative Defense: Plaintiff's own negligence is the sole and/or contributory cause of the occurrence set forth in the Complaint. Plaintiff is therefore barred from recovery and/or limited with respect to recovery.
- Tenth Affirmative Defense: The concurrent acts of others, and not of the Defendant, the United States, were the proximate cause of the occurrence set forth in Plaintiff's Complaint. Plaintiff is therefore barred from recovery and/or limited with respect to recovery.
- Eleventh Affirmative Defense: The acts of others, and not the Defendant, the United States, were the sole and proximate intervening and/or superseding cause of the occurrence set forth in Plaintiff's Complaint. Plaintiff is therefore barred from recovery and/or limited with respect to recovery.
- Thirteenth Affirmative Defense: Any injuries, loss, or damage sustained by Plaintiff were caused in whole or in part by the Plaintiff's culpable conduct, and any recovery by Plaintiff must be reduced proportionately by the percentage of such culpable conduct. 42 Pa. Cons. Stat. § 7102(a) (Westlaw 2007).
- Fourteenth Affirmative Defense: Plaintiff's injuries or damages, if any, were caused by the negligent or wrongful acts of third parties that were not under the control of the Defendant, the United States.
- Eighteenth Affirmative Defense: If Defendant, the United States, was negligent, which is expressly denied, others were also negligent. Defendant may thus only be held liable for its proportionate share of fault, if any.

As an initial matter, Defendant does not object to Plaintiff's motion as it pertains to the Fourth Affirmative Defense. (ECF No. 42 at 5 n.4.)  Moreover, with respect to the Thirteenth Affirmative Defense, the undisputed facts of record do not support a defense that Plaintiff's conduct caused her injuries, loss or damages, and therefore, Plaintiff's summary judgment will be granted with respect to this defense as well.[8] Likewise, with respect to the Eighteenth Affirmative

---

[8] While Defendant did not explicitly concede that Plaintiff's motion has merit as it pertains to the Thirteenth Affirmative Defense, it notes in its brief that it does not "claim that Plaintiff . . . was personally at fault in causing the accident." (ECF No. 42 at 1.) Defendant is not precluded from presenting evidence at trial that Plaintiff failed to mitigate her damages as pleaded in its Ninth Affirmative Defense.

Defense, the Court agrees with Plaintiff that it is entitled to judgment in its favor because as a matter of law, there cannot be an apportionment of liability at trial between Defendant and a non-party. *See Harris v. Kellogg Brown & Root Services*, 724 F.3d 458 (3d Cir. 2013).

In support of its motion with respect to the remaining defenses at issue, that is, the Tenth, Eleventh and Fourteenth Defenses, Plaintiff points to the record evidence, including the Army's internal investigation, which concluded that Nicholson was at fault in the accident.   Defendant does not dispute that Nicholson should have continued to wait at the stop sign and not inch out into traffic. Rather, it contends that the conduct of Plaintiff's daughter in speeding, driving without insurance, and driving without a valid state inspection, in violation of three separate Pennsylvania statutes, was a superseding cause of the accident which relieves it from liability.

"A superseding cause is an act of a third person or other force which, by its intervention, prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bring about." *Von der Heide v. Dept. of Transp.*, 718 A.2d 286, 288 (Pa. 1998) (internal quotations and citations omitted). To constitute a superseding cause, the act must be "so extraordinary as to not have been reasonably foreseeable." *Id.* "When facts are in dispute or room exists for a difference of opinion as to whether certain conduct is superseding or where facts are such that reasonable minds could differ as to whether the intervening act or cause constituted a superseding act or cause, the question is one for submission to the jury." *Powell v. Drumheller*, 653 A.2d 619, 624 (Pa. 1995) (quoting 57 Am. Jur. 2d *Negligence* § 601).

Defendant asserts that the conduct of Plaintiff's daughter by driving without a state inspection and without proof of insurance, along with her alleged speeding, is a superseding cause of the accident.   However, summary offenses such as driving without an inspection and driving without proof of insurance are inadmissible in civil actions arising out of the same incident. *See*

*Stumpf v. Nye*, 950 A.2d 1032, 1040 (Pa. Super. 2008).  Moreover, there is no credible evidence of record that these violations had any role in the accident.

With respect to the defense that Plaintiff's daughter was speeding at the time of the accident, it is uncontroverted that the Pennsylvania National Guard conducted a "financial liability investigation of property loss." (*see, e.g.,* ECF No. 40-4 at EN0004-05, EN0030, EN0068-69.) The investigation resulted in a recommendation of financial liability based principally on the conclusions in the police report that Nicholson was at fault for pulling out in front of the car driven by Plaintiff's daughter and that there was no evidence that she was at fault.[9] (*Id.* at EN0004-05.) As a result of this investigation, Nicholson was notified that "an approved charge of financial liability ha[d] been assessed against [him] by the United States Government." (*Id.* at EN0002.)

Defendant argues that it was the Pennsylvania National Guard, not the United States, that performed the investigation.  No direct evidence or legal argument was presented regarding whether the National Guard was acting on behalf of the Army or the GSA in conducting the investigation and therefore, whether its statements can be construed as those of Defendant. However, based upon the documents in the record about the investigation and the fact that as a result of the investigation, Defendant assessed Nicholson with financial liability for the damage to its car, it appears that at a minimum, the National Guard was acting on behalf and/or as an agent for the Army.  If so, its recommendations are admissible as admissions of a party opponent and/or a statement against interest.  *See* Federal Rules of Evidence 801(d)(2) and 804(b)(3).[10]  At any

---

[9] Notably, the initial investigator stated that the evidence "suggests that soldier may be at fault." At the next level of review, liability was recommended based on the police report and the recommendation/assessment of suspected negligence. (ECF No. 40-4 at EN0004-05.)

[10] At the same time, it is noted that the police report itself is inadmissible hearsay.

rate, the GSA's ultimate assessment of financial liability is admissible evidence, either because it is not hearsay (F.R.E. 801(d)(2)) or is an exception to the hearsay rule (F.R.E. 804(b)(3)).

Plaintiff argues that Defendant cannot be permitted now to take the paradoxical position that Nicholson was solely at fault for the purpose of the assessment of financial liability for damage to the government vehicle, while simultaneously arguing that Plaintiff's daughter was the sole cause of the accident. However, the investigation conducted was for the purpose of assessing financial liability and may (or may not) be subject to an entirely different standard than the burden of proof in a civil lawsuit. Moreover, the National Guard personnel had no personal knowledge about the accident and placed heavy reliance on the police report, which is inadmissible hearsay.[11]

Plaintiff also contends that Nicholson is negligent as a matter of law based upon the finding of financial liability. However, the Court cannot reach this conclusion based on the current record. In addition to the issues discussed above, the record reflects that Nicholson never admitted liability, and while it is uncontroverted that he stopped at the stop sign and then proceeded into the other vehicle's lane of travel, it is at least possible that **if** Plaintiff's daughter was speeding, her actions could have independently caused the accident.

The Court is required to view all facts and draw all inferences in the light most favorable to the non-moving party on this issue. Therefore, while it is an extremely close call, the Court declines to grant Plaintiff's motion regarding these defenses at this time.

Accordingly, Defendant's motion for partial summary judgment will be granted with respect to Defendant's Fourth, Thirteenth and Eighteenth Affirmative Defenses, as well as with

---

[11] The subsequent deposition testimony of the police officer is not relevant to determine the basis for the GSA's decision to hold Nicholson financially liable.

respect to the inadmissibility of the summary offenses with which Plaintiff's daughter was charged regarding the Tenth, Eleventh and Fourteenth Affirmative Defenses, and otherwise denied.

## V.     CONCLUSION

Based upon the foregoing, the Court will deny Defendant's motion for partial summary judgment and grant Plaintiff's motion for partial summary judgment in part. Appropriate orders follow.

BY THE COURT:

Date:  June 10, 2020                              PATRICIA L. DODGE
United States Magistrate Judge